# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | | |
|---|---|---|
| JOHN E. WINFIELD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:14CV1022 CDP |
| | ) | |
| TROY STEELE, et al., | ) | |
| | ) | |
| Defendants, | ) | |

## MEMORANDUM AND ORDER

Plaintiff John E. Winfield is scheduled to be executed by the state of Missouri on June 18, 2014. He filed this suit under 42 U.S.C. § 1983 on June 3, 2014, alleging that defendants violated his rights under the Due Process Clause of the United States Constitution. Specifically, he alleges that defendants have interfered with his right to seek executive clemency by intimidating an employee of the Missouri Department of Corrections who would otherwise have taken actions to support Winfield's clemency petition. I held an evidentiary hearing on Winfield's motion to stay his execution and for a preliminary injunction on June 10, 2014. For the reasons that follow, I will grant the motions.

## Facts

Winfield's conviction and sentence became final in 2000, and his federal habeas proceedings ended in 2007. On May 9, 2014, the Missouri Supreme Court

scheduled plaintiff's execution for June 18, 2014. In 2007 this Court appointed counsel to represent Winfield in clemency proceedings under 18 U.S.C. § 3599(e). Counsel are currently in the process of seeking clemency from Missouri Governor Jay Nixon, and are providing information to the Missouri Board of Probation and Parole in the next few days.

The evidence showed that on the weekend of May 17 and 18, 2014, Jessica Sutton, one of Winfield's attorneys, came to the home of Terry Cole, the laundry director at Potosi Correctional Center, where Winfield is incarcerated.[1] Cole supervised Winfield in the laundry at PCC for five years. In response to counsel's request, Cole told counsel that he supported Winfield's request for clemency, and that he was willing to provide a letter that could be included in a clemency request.

On Monday, May 19, 2014, Cole spoke to Brenda Ross, a PCC administrator assigned to deal with policy and legal issues. He asked her about the prison policy regarding letters supporting clemency, and she told him that there was no policy either against it or in favor of it. She told him that it is up to the individual employee. She told him that if he did speak to counsel or write a letter, he should be sure that it was clear he was expressing his own opinion and was not speaking for the Department of Corrections. Several witnesses testified that it is

---

[1] Counsel had approached Cole about a year ago and asked generally whether he would support Winfield's clemency, but she did not actually ask him to sign anything until May of 2014.

also policy that staff members must report to their supervisors if they have any contact with attorneys for an inmate.

That same day Cole told his supervisor at the time, Larry Jody Glore, that Winfield's counsel had come to his home and asked him to write a letter. Glore immediately called Warden Troy Steele to tell him about the conversation, and Warden Steele told Glore that an attorney coming to an employee's home was a serious matter and that he should ask Cole for a written statement. Glore did so and Cole provided a written statement the next day.[2] Cole told Glore that he did not intend to write a letter supporting clemency.

On Tuesday, May 20, 2014, James Nicholson, an investigator with the Missouri Department of Corrections Investigator General's office, summoned Cole to his office. He told Cole that he was under investigation for alleged "over-familiarity" with Winfield. Nicholson told Cole that there were allegations that he had met with Winfield's family and attorneys. Cole denied ever meeting or talking to the family, but admitted that he had met with counsel.

It is Missouri Department of Corrections policy that employees can write letters in support of clemency, so long as they do not indicate that they are speaking for the department. When a staff member is under investigation, he is not permitted to discuss the investigation or to participate in activities potentially

---

[2] Cole wrote the statement to Glore after he learned he was under investigation.

relating to the investigation. Cole believed that this policy meant he could not support plaintiff's clemency efforts while the investigation was pending. Nicholson confirmed to him that this was the case. At the conclusion of the conversation, Nicholson asked Cole to write a statement, which Cole did. In his statement, Cole denied that he had agreed to write a clemency letter.

Attorney Sutton came back to Cole's home on May 22, 2014, and provided him with a typewritten declaration that included the things Cole had told her before about Winfield. Cole told Sutton that he was under investigation for over-familiarity and that he was concerned that signing the declaration could place his job in jeopardy. After more discussion, he agreed to sign the declaration because Sutton agreed to redact it and remove all information that could identify him as the person providing the declaration. He testified at the hearing that he was concerned about the public and his employer knowing his identity, because people have different views on these issues. The declaration Cole signed is very favorable to Winfield. It states, among other things, that although he did not disagree with the death penalty generally, he did not believe it was appropriate for Winfield. The declaration stated that Winfield is in the "elite 1% of all inmates." It described plaintiff as a compassionate and generous person who has the ability to mentor young inmates and change their lives. Cole stated that he had seen Winfield help

other inmates, was a very good worker, and had the respect of prison staff and other inmates.

At some later point, Sutton provided an additional draft declaration for Cole to sign. This one included many of the same favorable statements about Winfield, but also included statements to the effect that Cole feared for his employment because immediately after telling people at the prison that he had spoken to Winfield's counsel he came under investigation for over-familiarity. Cole did not sign this statement, and testified that he did not agree with the portion that said he was concerned for his job.

On May 27, Sutton texted Cole and asked him if he had received the new declaration. His wife, on his behalf, then texted the following response from Cole's phone:

> Jessica, after considerable debate and discussion with my wife, I have decided that I cannot sign the declaration at this time due to the current pending investigation. It is also my wish to rescind the redacted copy that I have already signed as well. Some concerns have arisen that Nancy and I have due to this current investigation, however, once I have received a final disposition of the unmerited investigation in which is an utterly ridiculous claim of over-familiarity, I will have no problem in signing either declaration. Sorry.

Cole did not talk to Sutton again.

On May 28, Nicholson provided a report finding the allegations of over-familiarity to be unfounded. He sent the report to Warden Steele, but no one

5

notified Cole of the results of the investigation until June 4, when he was again interviewed by an investigator from the Inspector General's office.

When counsel filed this suit on June 3, they filed the complete signed declaration under seal and *ex parte* and filed the redacted copy in the public file. On June 4, 2014, after hearing news reports indicating that a correctional officer at PCC was under investigation for assisting Winfield's counsel in clemency proceedings, the MDOC Inspector General sent Paul Wilson to PCC to investigate the news reports. He conducted a very lengthy interview of Cole. During the interview he told Cole, for the first time, that the over-familiarity investigation had been concluded and the allegations had been deemed unfounded.

Cole testified that he had gone back and forth in trying to decide whether to assist Winfield. When he was questioned by prison officials, however, Cole consistently denied signing a letter or agreeing to help Winfield in any way. After Wilson repeatedly told him that it would be "fine" if he had signed something, Cole ultimately admitted that he had provided the statement to Sutton. Wilson said, "You won't be in any trouble for providing something that you are allowed to provide. . . . If you did, . . . that's fine . . . but don't feel like you have to say no, you didn't, because you think you might be in trouble for it, because you are not." After that statement, Cole admitted that he had signed the document.

6

At the hearing, and when he spoke with Wilson, Cole denied ever being threatened. Similarly, he told Sutton that no one had directly threatened him. Sutton testified, however, that Cole told her he was very concerned for his job and believed the investigation was prompted by his cooperation with Winfield's attorneys. Cole stated several times that he found it was "odd" or "weird" that the investigation began the day after he told prison officials that he had spoken to Winfield's counsel, and that he was "concerned" about the investigation. When Wilson questioned him repeatedly about whether he had been threatened, Cole said he had not.

But Cole also told Wilson that he did, in fact, feel threatened. He stated: "I am still apprehensive. And I do feel threatened. I feel threatened and no I am not going to write a letter. I am not going to sign something like this right here. Was there a redacted copy? Sure there was a redacted copy." Cole confirmed at the hearing that he no longer wants to provide a letter or support for Winfield's request for clemency.

Defendants presented evidence that the investigation into Cole's over-familiarity with Winfield was begun because of a report from another inmate. In late December and early January an inmate wrote letters to a correctional officer indicating that Cole was suspiciously close to Winfield, that Cole had visited Winfield's family and talked to his death penalty attorney, and that prisoners who

7

worked in the laundry under Cole's supervision were extorting money from other prisoners. The complaint indicated that the inmates working in the laundry were making significant money from "customers," that is, from other inmates for whom they provided additional laundry services such as sorting, folding, and pressing, and were pressuring "non-customer" inmates to pay by not providing them with good service. The letter indicated that inmates had reported this money-making venture to Cole, but he did not do anything to stop the practice. In March, Warden Steele asked the Inspector General to investigate the inmate's allegations. These are the allegations that Nicholson ultimately began investigating on May 20, the day after Warden Steele and other officials learned that Cole had spoken to Winfield's attorney. Nicholson chose not to investigate the allegations about laundry workers charging inmates for services, because he was only concerned with the allegations of over-familiarity, as he considered those to be a threat to the security of the institution. In addition to interviewing Cole, Nicholson also interviewed Glore and Ross, again focusing on Cole's communications with Winfield's lawyers.

## **Discussion**

It is a violation of due process for state officials to frustrate a state-created clemency procedure by threatening the job of a witness. *Young v. Hayes*, 218 F.3d 850, 853 (8th Cir. 2000). In *Young*, an assistant prosecutor wanted to file

information with the governor in support of the petitioner's clemency proceedings. *Id*. at 851. Her employer, the Circuit Attorney for the City of St. Louis, threatened to fire her if she did so. *Id.* The Court of Appeals held that the allegation stated a claim for violation of the Due Process Clause. *Id.* at 853. "The Constitution of the United States does not require that a state have a clemency procedure, but, in our view, it does require that, if such a procedure is created, the state's own officials refrain from frustrating it by threatening the job of a witness." *Id.* The court stayed the plaintiff's execution and remanded the action to the district court for further proceedings on the due process claims. *Id.*

Here, Winfield argues that the MDOC's over-familiarity investigation was meant to threaten and harass Cole so that he would not write a declaration in support of Winfield's clemency petition. Winfield argues that the intimidation of this witness violates his right to due process. In his motion for a preliminary injunction, Winfield requests an order "restraining the defendants or their agents from obstructing, pressuring, discouraging, or otherwise threatening any correctional employees from providing statements in support of Mr. Winfield's clemency efforts." To determine whether preliminary injunctive relief is warranted, the Court must balance the threat of irreparable harm to movant, the potential harm to the nonmoving party should an injunction issue, the likelihood of

9

success on the merits, and the public interest. *Dataphase Sys. v. CL Sys.*, 640 F.2d 109, 113-14 (8th Cir. 1981) (en banc).

In *Hill v. McDonough*, the Supreme Court of the United States held that a motion to stay execution did not have to be brought as a habeas action, but could proceed under § 1983. 547 U.S. 573, 579-83 (2006). The Court stated "that a stay of execution is an equitable remedy. It is not available as a matter of right, and equity must be sensitive to the State's strong interest in enforcing its criminal judgments without undue interference from the federal courts." *Id.* at 584.

I conclude that Winfield has shown that he is likely to succeed on the merits of his Due Process claim. The evidence presented to me shows that Winfield is likely to be able to prove at a later trial that prison officials took actions to intimidate Cole to keep him from providing support for Winfield's clemency petition. Obviously, Winfield's success on the merits is not without question. Cole denies being threatened, although his demeanor, and the recording of his interview with Wilson, shows that he was intimidated and feared for his job. Cole also did not tell MDOC the truth when they began the investigation. But when all the evidence is considered, I conclude that Winfield has shown that at a trial on the merits he is likely to be able to prove that Cole, in fact, changed his decision because of the over-familiarity investigation. Although Nicholson testified that it was just a coincidence that he performed his investigation the day after the

department learned that Cole had been in contact with Winfield's lawyers, it is likely that a fact-finder would not believe that. There had been no investigation for several months after the inmate made his allegations against Cole, and then the flurry of activity began the day after Cole reported the contact with attorneys. The investigation ignored allegations of prisoner misconduct and focused only on the alleged over-familiarity issue. Both the department policy requiring staff members to report contact with inmates' attorneys and the requirement that employees may not discuss anything that is under investigation show, in this context, that the department discourages employees from supporting inmates seeking clemency. Although, unlike the *Young* case, there is no evidence of any direct threats to Cole, there is substantial evidence that the department's actions caused Cole to fear that his employment would be negatively affected if he continued to support clemency. And there is substantial evidence that Cole was, in fact, deterred from supporting the request for clemency.[3]

The other *Dataphase* factors support both entry of the stay of execution and the preliminary injunctive relief that is requested. The risk of irreparable harm to Winfield is obvious, and although I recognize that the state has a legitimate interest in carrying out executions without federal interference, the balance of the harms is still in Winfield's favor. And the public interest is always in favor of due process.

---

[3] The facts of this case may also have the effect of chilling any other MDOC employees who might be inclined to support a clemency petition for a death row inmate.

I was initially concerned that Winfield's attorneys had unreasonably delayed filing their clemency petition,[4] which had the effect of causing this new lawsuit to be filed only weeks away from the execution date. At the hearing counsel explained that in Missouri, clemency petitions are not normally filed until an execution date is set, and the time frame here is not at all unusual. Winfield's counsel only learned for sure that Cole was refusing to submit his statement on May 27, and they filed this suit one week later, on June 3. I therefore conclude that there has been no unreasonable delay in seeking relief from the court.

Finally, there is a question of mootness. The Court must consider whether the conclusion of the MDOC's investigation of Cole on May 28 means that any alleged threat to Cole's job has been removed and thus that Winfield's claim of state interference with due process is moot. However, because the conclusion of the MDOC's investigation could be viewed as "nothing more than the voluntary cessation of allegedly illegal activity," the case is not moot. *See Young*, 218 F.3d at 852. And although a case might become moot if subsequent events make it clear that the wrongful behavior cannot reasonably be expected to recur, this is a heavy burden of persuasion that lies with the party asserting mootness. *See id.* (internal

---

[4] The standard for granting a stay of execution overlaps with the standard for granting a preliminary injunction. However, in addition to consideration of the prisoner's likelihood of success on the merits and the relative harm to the parties, a stay of execution also requires consideration of the extent to which the prisoner has unnecessarily delayed his or her claims. *Hill v. McDonough*, 547 U.S. 573, 584 (2006); *Nelson v. Campbell*, 541 U.S. 637, 649-50 (2004).

citations omitted). Defendants have not shown that the MDOC will not attempt to further coerce Cole or otherwise interfere with his (or other employees') efforts to support Winfield's clemency. Indeed, a trier of fact might infer that Cole's current unwillingness to support Winfield's clemency is the result of ongoing pressure from the defendants. In light of the foregoing, I conclude that Winfield's claims here are not moot.

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Stay of Execution [#4] and Motion for Preliminary Injunction [#10] are granted. A separate Preliminary Injunction and Stay of Execution is entered this same date.

_____
CATHERINE D. PERRY
UNITED STATES DISTRICT JUDGE

Dated this 12th day of June, 2014.